Appellant Hubert E. Hope was convicted of conspiracy to murder Alabama Attorney General Charles A. Graddick. Hope was sentenced to 25 years' imprisonment. Notice of appeal was filed, but no record was ever provided and on June 8, 1982, this court dismissed the appeal for failure to file a transcript of record. Hope v. State, 418 So.2d 980 (Ala.Cr.App. 1982). Hope subsequently filed a petition for writ of error coram nobis. Several motions for a transcript of record of his trial at state expense were also filed, which motions were denied and are before us, together with the circuit court's denial of the coram nobis petition after a lengthy hearing.
Appellant Hope contends that his petition should have been granted because, 1) he was ineffectively represented at trial and with respect to his appeal, and 2) the court should have found him to be indigent at the time for taking the appeal and provided him with a transcript. These issues were taken up at the circuit court hearing on his petition and a transcript of that proceeding is before us.
 I Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984), sets out the test for determining effectiveness of counsel: 1) did counsel's conduct so undermine the proper functioning of the adversary process that the trial cannot be relied on as having produced a just result? 2) was assistance of counsel reasonably effective? 3) is there a reasonable probability that the outcome of the case would have been different, but for counsel's errors? That decision is controlling in this state. See Baldwin v. State, 456 So.2d 129
(Ala. 1984). This standard changes the former Alabama standard from "a farce, sham, or mockery of justice" to an objective standard of reasonableness. This "new" standard, which has been in effect in the federal courts for some time, also employs the "former" principle that a defendant is not entitled to an error-free performance of counsel. Mylar v. Alabama,671 F.2d 1299, rehearing denied, 677 F.2d 117 (11th Cir. 1982), cert. denied, 463 U.S. 1229, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983). *Page 638 
Turning first to Hope's contention that he was ineffectively represented at trial, his able appointed counsel on this coram nobis appeal has drawn our attention to a number of items which, he contends, constituted evidence of ineffective assistance. A brief background of the Hope proceedings may be useful.
Two sons of Hubert E. Hope were convicted of felonies in Shelby County, Alabama, and were incarcerated in the Alabama prison system. A convict, Jessie Jett, was in the habit of suggesting to other inmates or to their families that they could possibly obtain release through federal post-conviction proceedings. He referred some of the people who responded to his suggestion to Mr. Jack Smith, an attorney who had represented him in the past. Jett wrote to Mrs. Hope suggesting the possibility of release of one of her sons. The Hopes responded, met with Jett and eventually met with Mr. Jack Smith and an associate of his, Mr. Newton. The Hopes went to Mr. Smith's office in Dothan to deliver their son's trial transcript to him, and proceedings were apparently instituted in the federal court on behalf of one of their sons. Thereafter, Hope visited Jett in prison several times and it was at this time that their conversation turned toward the attorney general and the Shelby County officials whom Hope blamed for his sons' going to prison. At some point, inmate Jett was wired with concealed voice transmission equipment and a number of hours of conversation between Jett and Hope were recorded.
The charges of conspiracy to murder filed against Hope were made as the result of what he said during these recorded sessions. Hope was indicted for the conspiracy to murder Attorney General Charles Graddick, District Attorney Billy Hill, and Judge Harold Walden. Hope was tried and convicted of conspiracy to murder Charles Graddick. Thereafter, the charges to murder the district attorney and the judge in Shelby County were nol-prossed.
Hope was tried in Elmore County, Alabama, since this was the county where Jessie Jett was imprisoned and where the conversations constituting the prosecuted conspiracy took place. Judge Walter C. Hayden, Jr., was the judge at Hope's trial. He was also the judge who conducted the coram nobis hearing now before this court.
Hope and his family employed Mr. Lawrence Sheffield of Bessemer, Alabama, to defend him in this case. The evidence indicated that Mr. Sheffield completed law school in 1955, that he devoted himself primarily to the criminal practice, and that 75% of his cases were tried within Jefferson County, approximately 25% in other counties. Mr. Sheffield testified that he tried cases "pretty much all over the state." Sheffield was assisted by his son in conducting the trial. It is his conduct of the trial that is the principal target of Hope in this coram nobis proceeding.
 -A-
It is contended that counsel fell below the accepted minimum standard by failure to file any discovery motions at the circuit court level. This criticism is readily answered by the record itself. It appears that the discovery motions were filed and complied with at the district court level. Mr. Sheffield testified that the state turned over copies of all the tapes to him and that they listened to those tapes.
At the coram nobis hearing the following occurred between counsel for the petitioner and witness Lawrence Sheffield on this subject:
 "Q: You say you filed some discovery motions in the case, did you file those in the circuit court level?
"A: We filed them in the district court level.
"Q: Did you file any in the circuit court level?
 "A: We had — we had all of the evidence that the state had at the time that we went to trial."
Mr. Sheffield further explained, "The information that was ordered by the court was furnished to the defendant by the state. We had — there were no witnesses *Page 639 
out there in this case that we could call in to alleviate the circumstances." No injury was suffered by Hope by virtue of not filing discovery motions in circuit court; the matter of discovery had already been resolved in his favor.
It is suggested by counsel for the petitioner in this coram nobis proceeding that the state may not have furnished the defendant with all the tapes of the conversation between the defendant and Jett. In the hearing the following transpired in this respect:
 "Q: Mr. Sheffield, at the trial of the case, did the state attempt to offer into evidence tapes, recorded tapes, or transcripts from recorded tapes that you had not heard of before?
"A: No."
He further testified that he did not find any discrepancies between what the state had been ordered to do and what the state did.
 -B-
Counsel on coram nobis urges us to hold as a matter of law that failure to associate local counsel for purposes of striking a jury constitutes ineffective representation. We note at the outset that the intended victim of the alleged conspiracy to murder is an elected state official who had people who voted for and against him in every county in the state. He was not shown to have any particular contact with Elmore County.
As to witnesses, Jett's physical presence in Elmore County resulted from his legal incarceration as an inmate of a state prison located in that county. This fact would certainly not bolster his credibility over that of another witness. The principal evidence in the case consisted of the tapes of dialogues between Hope and Jett. It could hardly be said that local counsel would be better able to select jurors who would react in one way rather than in another to a taped recording. When asked about his practice of associating local counsel, Mr. Sheffield stated, "No sir, I have never associated local counsel in any major criminal case I have ever tried since I was [sic] practicing law." He also stated, "I voir dire the jury to the extent that I deem it necessary in every case." He mentioned he had received some suggestions from someone regarding jurors; Sheffield stated there was a lawyer there "who mentioned 2 or 3 people on the venire they thought that I would be better off without for various reasons, and I gave that consideration in striking the jury." In short, we are unwilling to hold and do not believe that failure to associate local counsel for purposes of striking a jury constitutes ineffective assistance of counsel. Furthermore, the appellant has not shown how in reasonable probability he was prejudiced by his attorney's practice.
 -C-
The next ground for claiming ineffective representation is that counsel failed to call witnesses to impeach Jessie Jett or to "explain the relationship" between Jessie Jett and Hope. It is contended that Jessie Jett was the primary state's witness and that his testimony convicted petitioner Hope. We perceive from the record that this contention is absolutely incorrect. The trial judge stated for the record that it was the tapes of conversations between Hope and Jett that were the primary state's evidence in the case and that the tapes afforded the grounds for a conviction. The court stated for the record, "In my opinion, the jury's finding of guilty was sustained by what was on those tapes and by [Hope's] actions in putting that rifle and the money in the car there in Clanton, Alabama." The court during Hope's testimony in this hearing reminded Hope that he was the judge who heard the case, and stated, "[W]hat was said on those tapes is pretty well what convicted you." It was also the state's position throughout the coram nobis hearing that the tapes, in other words, Hubert E. Hope's own recorded statements, caused his conviction.
As regards Jett, it was evident from the testimony of Mrs. Hope, as well as from Jett himself, 1) that he was a convicted felon, since he was a prison inmate; 2) that *Page 640 
he encouraged the filing of federal post conviction remedies and raised the anticipations of the families of other prisoners that they might soon be released; and 3) that he referred these families to certain lawyers who had filed petitions in federal court on behalf of state penal system inmates. Mr. Sheffield stated, "Within the limits that it was possible to do so, I think that Jessie Jett on the stand in the trial of the case pretty much revealed the same information we would have had to bring some other way." With respect to impeaching the credibility of Jessie Jett, petitioner's counsel asked Mr. Sheffield,
 "Q: Did you contact any prison officials, though, with regards to impeaching the credibility of Mr. Jessie Jett?
 "A: Jessie Jett's credibility was impeached the moment he took the stand. Nobody respected Jessie Jett as an individual. He was a convicted criminal many times over. I think the jury looked on him with distaste. I don't think they convicted Hubert Hope on the testimony of Jessie Jett. They convicted him on those 5, or 6, or 7 hours of tapes that were played here in the courtroom."
We find that no further impeachment of Jessie Jett was necessary.
 -D-
It is next contended that Hope received inadequate assistance because attorneys Jack Smith and Austin Newton were not called as witnesses. Each of them testified at the coram nobis hearing. Mr. Jack Smith testified that he met Hubert E. Hope at the prison pursuant to an appointment arranged by Jessie Jett. He testified that Mr. Hope wanted him to examine the transcript of the trial of one of Hope's sons with an eye to filing a petition for writ of habeas corpus or otherwise in regard to some newly discovered evidence. He testified that Hope later came to Dothan to see him and delivered the transcript in the case, together with a retainer fee. Mr. Smith testified that he later read that Mr. Hope was himself having some problems. They talked with Mrs. Hope and she came back down to Dothan and said that Hope's money was needed for his own criminal defense and that resolved the question of any further representation. Mr. Smith said he refunded the money to Hope, except perhaps $100.
Mr. Austin Newton testified that he was an attorney retired from practice in Washington D.C. He accompanied Mr. Jack Smith on his visit to the prison when they first met Hubert Hope. This attorney was requested to look into the possibility of petitioning for certiorari directly to the Supreme Court of the United States. Evidently this proposed transaction fell through at the same time Smith's did, when the Hopes said they needed their financial resources for Mr. Hope's defense.
The argument is that Mr. Jack Smith or Mr. Austin Newton might have given evidence favorable to Hope by way of stating what Hope's relationship was with Jett. It is apparent that the relationship of the attorneys to Jett was closer than their relationship to Hope, for Mr. Jack Smith was the attorney to whom Jett referred people. And it might be reasonably assumed that this would be reflected in their testimony. When Sheffield was asked about using these people as witnesses, the following transpired:
 "Q: They were, what you would call witnesses that would confirm the relationship between Hope and Jett as being one of seeking legal advice on the part of Mr. Hope for legal assistance of his son?
 "A: That might possibly have worked in that fashion and it might also have worked in exactly the reverse fashion. These individuals were aware of Mr. Hope's feeling with reference to the conviction of his sons. And since the thrust of the charge against Mr. Hope was designed to harm these three individuals, I did not think that the benefit that their information could have given with respect to his relationship to Jessie Jett would have outweighed their revealing before the jury an animosity, or any animosity, that Mr. Hope might have felt towards the people ____" *Page 641 
Sheffield testified that he accepted Mr. Hope's version of his relationship with the lawyers in Dothan. He added that if he had put these witnesses on the stand, "I think the attorney-client relationship between Mr. Hope and those lawyers would have been waived, and on cross-examination some things that they would have said could have hurt Mr. Hope. And I did not want to take any chances." Sheffield said that he had dealt with Hope for a long time and that every time he talked with him he had a very difficult time confining the conversation to his case because of Hope's deep-seated feelings about his sons. He presumed Hope communicated to the Dothan lawyers "the same way."
We find as a fact that the decision not to call the Dothan attorneys as witnesses for Hope was soundly based on the opinion that the potential for good was outweighed by the potential for harm. The decision does not appear to be an error of judgment.
 -E-
It is next contended that Hope received inadequate assistance of counsel because of the dealings with a potential volunteer witness, one Solomon Looney Smith, Jr., also known as Bubba, (hereinafter called Mr. Bubba Smith), a 38-year-old man. Mr. Bubba Smith testified that he lived in Elmore County and hauled mobile homes for American Mobile Homes Transit in Montgomery. At the hearing below, he testified that he considered himself to be a lay preacher and that he is now a licensed minister. He was not known to any of the parties to this case until Hubert E. Hope's trial began. Mr. Bubba Smith had been sentenced to prison for stabbing his wife 28 times and causing her death. While in prison he met Jessie Jett. Jessie Jett told him that he had studied his case and thought he could get him out of prison and thereafter recommended a lawyer for him. Again, the lawyer was Mr. Jack Smith, who filed a writ in the federal court for the Middle District of Alabama. Eventually this writ was denied by Judge Myron Thompson, and Mr. Bubba Smith was eventually paroled. He testified that he knew nothing of the Hopes, but stated:
 "Well, I heard on the news that Jessie David Jett had gotten Mr. Hope here in a bunch of trouble. And I knew the people of Elmore County really didn't realize what kind of guy Jessie David Jett was, because they didn't have any dealings with him. And I come down here especially to let the people know what they was up against, and all this bunch of stuff was conspired. I just wanted the truth to be brought out, that's all. That's the reason why I come down here and spent three days down here to testify to that fact."
Mr. Bubba Smith brought his mother with him and told Mr. Sheffield that they wanted to testify that Jessie Jett had a bad character and reputation. Evidently Mr. Sheffield humored this volunteer witness and allowed him to wait outside the courtroom along with his mother, his aunt, Mrs. Hope, one of the Hope sons, a preacher, and other witnesses. At this time, Mr. Bubba Smith had numerous conversations with various members of the Hope family and others. Finally, he said, Mr. Sheffield said the judge would not let him testify. He testified that he was quite upset when he did not get to testify. He testified that although he knew none of the facts of the case — he had heard none of the testimony — he felt that they were sending Hope to prison for a bunch of "hogwash." He said further "Well, I know Jessie Jett and that pretty well, as far as I'm concerned, explains the whole thing, because I know how Jessie Jett leads people on and comes up with off-the-wall stuff."
The decision on the part of counsel to not call Mr. Bubba Smith was not a bad decision. The proposed witness desired to vent his emotions by attesting to the bad character of someone whose bad character was already established. He was just another convict who had been persuaded by Jett to petition the federal court for relief. His presence was motivated by a desire for revenge. On this subject, the testimony of Mr. Sheffield was as follows: *Page 642 
 "Q: Okay. If you would, please, tell the court the demeanor of Bubba Smith during your conversations with him prior to — during the trial?
 "A: He did not appear to me to be stable. And I hesitate to put an unstable person on the stand in a crucial matter."
Mr. Bubba Smith testified that a psychiatrist in Montgomery who examined him in connection with his conviction for first degree manslaughter in the stabbing death of his wife, said he was a "pretty stable individual."
An issue was made at the coram nobis hearing over a statement of counsel. As Mr. Bubba Smith and others outside the courtroom understood it, Mr. Sheffield was supposed to have said, "The judge won't let you testify." Various witnesses were called to verify that these were the words spoken by Mr. Sheffield. The record reveals, however, that this conversation took place after both parties had rested and just before summation to the jury by counsel. At this point in the trial, of course, another witness could not have been called, and the statement was technically accurate.
One of the witnesses called to testify to the conversation between attorney Sheffield and prospective witness Mr. Bubba Smith in the corridor was the Reverend Burton Herring, pastor of the Rigsby Street Baptist Church in Montgomery, Alabama. He was a witness to the trial and heard the entire thing. He testified that he came to know Mr. Bubba Smith, "When he walked up during recess saying he had evidence to bust the case wide open." The Reverend Herring further testified, ". . . I had the utmost confidence in Mr. Sheffield. I thought he did an amazing job in presenting the case. I told him I thought — I didn't think anyone could've beat what he did here in the courtroom, and commented to him that I was glad that I had seen his work in the courtroom because I thought he did an amazing job."
Sheffield faced a difficult situation in dealing with Mr. Bubba Smith and we are of the opinion he acted correctly. There was no ineffective assistance of counsel with respect to the dealings of volunteer prospective witness Mr. Bubba Smith.
 -F-
It is next contended that Mr. Sheffield fell short of the representation standard by not calling character witnesses and by not subpoenaing character witnesses in this case. That character witnesses are customarily "requested" to come to court rather than subpoenaed and compelled to attend, is just about subject matter for judicial notice. Many trial counsel consider it the poorest of strategy to compel attendance in court of a witness who is to testify to the good character of the accused. In answer to the question, Mr. Sheffield responded:
 "Character witnesses don't have to be subpoenaed. I believe — I'm sure that I asked the family to get some character witnesses and bring them up here and meet me.
". . .
 "It has been my experience if you put witnesses on to testify favorably for an individual that you don't have to drag them into court with a subpoena."
Mr. Hope testified that while discussing character witnesses, Mr. Sheffield asked him, "Do you know of some good character witnesses that knows [sic] you?" and he replied, "Yes, sir. How many do you want?" Sheffield responded, "Oh, as many as you can get." Clearly then, the family, not the lawyer, were to secure such character witnesses as they wanted to have testify. They in fact did so, but only got three.
The three character witnesses called on behalf of the defendant were Messrs. Tommy Brock, Will Fulman, and Harold Scott. The two witnesses of whose nonappearance Hope specifically complains are Shelby County Coroner Billy Thompson, and Mr. Tom Snow, a former deputy sheriff. The coroner was a witness in another trial at the same time the Hope trial was going on and so was unavailable. Hope claimed that Mr. Thompson had been locked up by the Sheriff of Shelby County when he had indicated *Page 643 
that he might run against the Sheriff and would so testify. Hope then testified that he himself had made the statement that the reason they locked his sons up and "framed" them was to also prevent Hope from running for sheriff. He wanted Thompson's testimony to exonerate his sons, rather than himself.
Sheffield stated that he was never requested to subpoena certain witnesses. Sheffield stated, "In the state of the evidence at that time, I did not feel that 25 witnesses testifying of that particular fact [Hope's character] would cause any difference in the jury verdict."
He further said:
 "I called all that I felt were available that could do him any good. And in this case, there were not any that I felt would do any good. All of the people that had knowledge of this case were state's witnesses. They were people that had knowledge of it. You could cross-examine them and raise the devil with this all you want to on the stand. What you get out of them is what you get. After going back and looking at it right now I can't think of any witnesses that could have been called that could have assisted Mr. Hope or made the difference in the outcome of this case."
The admissible character testimony was limited because Hope did not testify. As Sheffield stated:
 "Of course, the truthfulness and veracity portion of the witnesses were not subpoenaed because — or called, because Mr. Hope did not take the stand and it was not any issue of the character portion of it — I think two or three witnesses came at that time and I did put them on and did ask those questions."
We find from the evidence in the record that Hope did not suffer from ineffective representation of counsel with respect to calling character witnesses or for failure to call character witnesses.
 -G-
It is next contended that Hope received inadequate assistance of counsel because counsel "denied Hope his right to testify which Hope wanted to exercise." Counsel for petitioner at the coram nobis hearing put the following question to Mr. Sheffield.
 "Q. Mr. Sheffield, when did you make the decision not to call Mr. Hope as a witness in this trial?
 "A. I did not make the decision. The question of testifying or not testifying had been discussed at different times during the preparation of the case. I think the ultimate decision was made by Mr. Hope at a little restaurant right here close to Wetumpka as [sic] the time when that would be necessary to be done came up. It was discussed — I think it was Mrs. Hope, Mr. Hope, Larry, my son, who assisted in the case, and I believe that my wife was present, and we discussed the testifying or not testifying."
". . .
 "The decision was made by Mr. Hope. He said he would rather not testify."
When asked if he recommended that Hope not testify, Sheffield stated, "I might have said something like — `Well, I think that's a good decision, Hubert, because of the things that we've talked about,' — sometimes of him saying things that could hurt him."
When asked if he had told Hope, as Hope contended he did, that he could guarantee him a new trial, Mr. Sheffield testified, "I don't think I've ever guaranteed the results of a case to any client that I can recall." He went on to say that in this case he never guaranteed a new trial.
When asked by the state on cross-examination what he felt Mr. Hope's demeanor would be on the stand, Mr. Sheffield stated,
 "It was my judgment that Hubert might and probably would have gotten upset about his sons' circumstances. I have been put in this position, so I'll just say it. I think that probably he would have talked about his feelings towards the people in Shelby County that were involved in the prosecution of his sons. Some of his statements, or some of his *Page 644 
testimony, could have harmed him before the jury, if that had occurred."
During the direct examination of Hubert E. Hope, his lawyer at the coram nobis hearing, asked him if all the statements contained in his affidavit were true. Mr. Hope then volunteered this remarkable response,
 "A: Well, down here where it says, `I wanted to testify' — I did, but I felt like I wasn't prepared. I didn't know what to testify to. There hadn't been no witnesses put on. If Mr. Smith and them had been put on this stand, and all of it been put on there, he couldn't have kept me off the stand."
Upon cross-examination, Mrs. Janice Williams, assistant district attorney, elicited certain things from Hope which presumably he might have stated at his trial. She asked him:
 "Q: Hadn't you said in the past that the reason they locked your boys up and framed them was to keep you from being sheriff?
"A: That's the reason, ma'am.
"Q: That is the reason?
"A: That's the reason."
Further:
 "Q: All right. Isn't it true Mr. Hope that you think all the Alabama court system is crooked?
 "A: I see you've been talking to some people in Shelby County. I do pray that we've still got some good ones that can still understand things but they're getting hard — they are getting far between.
 "Q: Haven't you made the statement in the past that the whole court system is in a mess, and that it stinks, and anybody can be bought off?
"A: Some people can — not all of them."
Further, the following transpired:
 "Q: Have you told people that your boys were both framed?
 "A: They was, ma'am, and I can prove it — I can prove it.
"Q: Mistreated.
"A: They was framed."
Thereafter, the following transpired:
 "Q: All right. Did you ever say this in reference to Harold Walden, `All you have to do is shoot up the front tires of his damn car before daylight and wait for the son of a bitch to come out of the barn, and knock the son of a bitch off, cut his damn throat, walk back across the field over there, and get in his car and leave.' (INDICATING)
 "A: Ma'am, that's — I think everybody knows that people will make statements."
Thereafter, the following transpired:
 "Q: Did you ever say that if they were to give your boys a new trial that they'd just buy `em another jury?
"A: Would — Shelby County would.
"Q: Did you make that statement?
"A: I don't remember it, but I probably did."
Thereafter, the following transpired:
"Q: Let me ask you if you ever made this statement,
 `Now, if Joe and them was out, hell, I'd do it myself — the whole bunch. I'd have my own damn execution. I would, to get rid of them son of a bitches. I'd do it in a damn second, because I realize that somebody has got to come through.'
"A: I don't — I said so much."
Thereafter, the following transpired:
 "Q: Mr. Hope, did you make this statement, `I'm going to take that rifle tonight and I'm going to cut. I'm going to take chisel and I'm going to cut every damn number there is on it off.' Did you make that statement? (INDICATING)
 "A: It's possible, ma'am, but it wasn't no numbers on it.
"Q: But you did make that statement?
"A: I don't know. We talked about so much."
Hope testified that the only reason he gave Jessie Jett the $500 was to enable Jett to have his wife travel from Illinois to visit him at prison. He testified that the rifle which he was to place in Jett's automobile, using the key Jett gave him, was to be a *Page 645 
gift to Jett's brother whom he did not know otherwise.
In summary, we find as a fact that Hubert Hope made his own decision not to testify. We further find as a fact that if cross examined at his trial, he would have been shown to bear deep animosity against his alleged intended victim, the attorney general, as well as numerous other people. His hatred and murderous intent would have been proven at trial as easily as Mrs. Williams proved them at the coram nobis hearing.
 -H-
It is next contended that retained counsel for Hope was guilty of ineffective representation because he failed to file any requested jury instructions. In testimony at the coram nobis hearing, however, Mr. Sheffield answered that the oral charge was sufficient. Mr. Sheffield stated, "I thought the instructions were clear in this case." This court has previously held that the failure to request jury instructions is "included in the `practical questions' that an attorney must deal with in formulating trial strategy, see Trammell v. State, 276 Ala. 689,166 So.2d 417 (1964), and, consequently, should be left to the trial attorney's judgment. Hall v. State, 421 So.2d 1334
(Ala.Cr.App. 1982); Goodman v. State, 387 So.2d 862 (Ala.Cr.App.) cert. denied, 387 So.2d 864 (Ala. 1980)." Zeigler v. State,443 So.2d 1303, 1306 (Ala.Cr.App. 1983), cert. denied, 83-68 (Ala. 1984); see also Woodyard v. State, 428 So.2d 136 (Ala.Cr.App. 1982), aff'd, 428 So.2d 138 (Ala.), cert. denied, 462 U.S. 1136,103 S.Ct. 3120, 77 L.Ed.2d 1373 (1983). We find no ineffective assistance with respect to jury instructions.
 -I-
Lastly, Hope contended that counsel was guilty of inadequate assistance when he failed to present evidence at the sentencing hearing. Mr. Sheffield testified, "I think Mr. Hope's probation report was a good report. I did not discuss it with the probation officer, but Mr. Hope — I felt that his probation report would be an acceptable report. I knew of nothing against Hope, where he lived, or anything derogatory about him." Counsel in effect found no inaccuracies in the presentence report that would require testimony to correct. We do not find that his conduct in this part of the case was ineffective or inadequate.
It must be remembered that when dealing with a claim of ineffective assistance of counsel, it is the quality of the asserted grounds, not the quantity, that matters. In the present case, none of the appellant's grounds, either individually or collectively, amount to a showing of ineffective assistance of counsel. Most of the asserted grounds concern matters of trial strategy, which are properly left to the judgment of trial counsel and will support a reversal only when there is a clear showing of inadequate representation. Smith v. State,446 So.2d 68 (Ala.Cr.App. 1984), Minnifield v. State, 439 So.2d 190
(Ala.Cr.App. 1983), Goodman v. State, 387 So.2d 862
(Ala.Cr.App.), cert. denied, 387 So.2d 864 (Ala. 1980).
It is also well established that, even if the game plan of the defense or a tactic should fail, such does not amount to ineffective assistance of counsel. Bass v. State, 417 So.2d 582
(Ala.Cr.App.), cert. denied, 417 So.2d 588 (Ala. 1982), Behel v.State, 405 So.2d 51 (Ala.Cr.App. 1981), Bridges v. State,391 So.2d 1086 (Ala.Cr.App. 1980). Hope has not met his burden of proving that Mr. Sheffield provided him ineffective assistance of counsel, as set forth in Strickland v. Washington, supra: 1) that counsel's conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result; 2) that the assistance provided by counsel was not reasonably effective; and 3) that there is a reasonable probability that the outcome of the case would have been different, but for counsel's errors.
 II -A-
Hope next contends that he was denied effective assistance of counsel in that a *Page 646 
free transcript was not obtained. This contention constitutes a major part of Hope's case at the error coram nobis hearing and on its appeal. As in every case of a failure to secure a transcript, the question of who was responsible for procuring the transcript is confused and each party contends the other was responsible for getting the transcript. In this case the issue is even more confusing because the testimony regarding the attorney's fee is in considerable conflict.
Sheffield testified that the total fee originally quoted to the Hope family was $60,000 or $65,000 and that there was to be a $10,000 amount, or up to that amount, for expenses as they were incurred. This arrangement was not carried out. He stated that he actually received $35,000 for his services and that this fee was to pay for his services to do anything and everything necessary up to and through the circuit court trial in the Graddick case. He testified that he told the Hope family that although the appeal was not contracted for in the original fee, that he "would do the lawyer work — the appellate work, but that I would not pay for the transcript." He testified that he talked with Leslie and Sue, members of the Hope family, concerning arranging to have the evidence in the case transcribed, since Hubert Hope had previously told him to handle the financial matters with Leslie and Sue. He said the cost of the transcript would have been around $3,000. Hope, on the other hand, testified that the $35,000 was to cover the attorney's fee and any costs, including those incurred during the appellate process. Therefore, the testimony was conflicting about who was to pay for the transcript. This conflict was for the coram nobis hearing judge to resolve. We recognize that it would be very unusual for any attorney to pay for a transcript or other court costs. After all, all costs of litigation are borne by the client, not the attorney. EC 5-8 and DR 5-103 (B), Alabama Code of Professional Responsibility. According to Mr. Sheffield's testimony, the burden rested on the client to pay for the transcript. This was in compliance with the ethical code. According to Mr. Hope, the agreement violated those provisions. We also note that the Hopes were not ignorant regarding transcripts, for they had secured transcripts of the trials of their sons. Nonetheless the transcript of Mr. Hope's trial was not ordered and the time for filing it did expire, thus causing his appeal to be dismissed.
 -B-
Mr. Hope next contended that he was indigent at the time the transcript was due to be ordered and that Sheffield should have petitioned for a free transcript. Mr. Sheffield testified that he knew that there had been some assignments of interest in the family's land, presumably to enable the Hope children to borrow money to help finance the defense of the Hope case. Sheffield testified:
 "— I called Judge Hayden a couple times about the matter. I could not say to Judge Hayden who was the owner of the land. If Hubert owned the land, then he was not indigent. I could not say to the court that he was indigent for the purposes of obtaining a transcript. I discussed it with the Court.
"Q: About —
"A: A couple of times.
 "Q: You called Judge Hayden about what now — discussing getting a free transcript?
"A: Yes. Judge Hayden asked me was he indigent.
"Q: Did you investigate that?
 "A: I investigated it to the extent that I told you that I knew what had been done with respect to the land. I would not presume that the ownership of the land — and I don't know what effect assigning land back and forth to family members is. I'm not going to be a part of making a representation to the Court that an individual is indigent unless I know it to be a fact."
When asked whether he had applied to the court for indigent status for Hope, he responded that he did not and said, "I think you have to make a representation that the person is in fact indigent in order to do that. And I'm not going to make a *Page 647 
representation to the Court that I don't know to be a fact."
There was a substantial doubt that Mr. Hope was in fact indigent at that time. Some paper transfers of the family property may have taken place between family members which were not intended to convey equitable ownership. These transfers may have been considered necessary by the family members in order for the family, other than the accused, to borrow money against the land. If these transfers out of Hubert Hope's name were in fact spurious, then if his attorney represented him to the court to be indigent, he would be party to a misrepresentation calculated to obtain fraudulently something of value from the State of Alabama, namely a free transcript. It appears that counsel knew or reasonably believed his client not to be indigent. It appears that he acted diligently in discussing indigency with the trial judge on two occasions. We note further that nowhere in the evidence is there any statement that he was requested to apply for indigency treatment for Hope. We conclude that Sheffield did what he could in this respect; he was aware of the situation, went so far as to discuss the problem with the trial judge, and did what he could ethically do. See DR 1-102 (A)(4): "A lawyer shall not: . . . Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, nor be guilty of wilful misconduct"; DR 7-102 (A)(5): "In his representation of a client, a lawyer shall not: . . . Knowingly make a false statement of law or fact"; DR 7-102 (A)(7): "In his representation of a client, a lawyer shall not: . . . Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent"; and DR 7-101 (B)(2): "In his representation of a client, a lawyer may: Refuse to aid or participate in conduct that he believes to be unlawful, even though there is some support for an argument that the conduct is legal." He did not fail to provide assistance of counsel in this regard. He did not fail to do something he was requested to do by his client.
The issue at that point seemed to have been whether the Hopes or Sheffield would pay for the transcript, rather than whether or not Hope was indigent. In that sense, then, since there was no finding of indigency, this case is not controlled by the landmark case of Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585,100 L.Ed. 891 (1956) (an indigent is entitled to a free transcript on appeal).
In denying Hope's petition, the trial judge determined that Mr. Sheffield was not at fault regarding the absence of a transcript, and, conversely, that Hope was at fault. Therefore, cases that have granted a defendant an out-of-time appeal because the original appeal was dismissed due to attorney error — dismissal through no fault on the part of the defendant — do not apply to Mr. Hope. See Evitts v. Lucey, ___ U.S. ___, 105 S.Ct. 830,83 L.Ed.2d 821 (1985) (retained counsel's failure to comply with state appellate procedural rule caused dismissal of appeal);Cantrell v. Alabama, 546 F.2d 652 (5th Cir.), reh'ing denied, 549 F.2d 203 (5th Cir.), cert. denied, 431 U.S. 959, 97 S.Ct. 2687,53 L.Ed.2d 278 (1977) (retained counsel's failure to see that the transcript was certified by the clerk of the trial court caused the appeal to be dismissed); Sturdivant v. State, 460 So.2d 1210
(Ala.), on remand, 460 So.2d 1213 (Ala.Cr.App. 1984), cert. denied, ___ U.S. ___, 105 S.Ct. 1391, 84 L.Ed.2d 781 (appointed attorney failed to timely file notice of appeal), in accord therewith, Longmire v. State, 443 So.2d 1265 (Ala. 1982), on remand, 443 So.2d 1270 (Ala.Cr.App. 1983), cert. denied, 83-48 (Ala. 1984), and its progeny.
A decision of this court has previously implied that the doctrine of invited error would apply where a transcript was not obtained because retained counsel advised the court reporter not to proceed with the transcript until advised to do so. Robinsonv. State, 444 So.2d 882, 884 (Ala.Cr.App. 1982) (Bowen, J., dissenting), rev'd, 444 So.2d 884 (Ala.), on remand,444 So.2d 885 (Ala.Cr.App. 1983). The exact issue before us is of first impression in this state; however, the state of Missouri answered it in Thomas v. State, 506 S.W.2d 487 (Mo.Ct.App. 1974). Since that opinion is short and the case remarkably identical to Mr. Hope's current appeal, we quote it in its entirety: *Page 648 
 "Movant Wardell Thomas was charged, tried and convicted of assault with intent to kill with malice. On December 29, 1969 the trial court sentenced Thomas to 20 years imprisonment and denied his motion for a new trial. Through his attorney James Bell, Thomas filed notice of appeal. The appeal was never perfected and on October 14, 1970 the trial court received a mandate from the Supreme Court affirming the judgment for failure to timely file a transcript. On June 2, 1972 Thomas filed a motion to vacate judgment and sentence under Rule 27.26. An evidentiary hearing was held October 20, 1972, the court finding appellant's contentions without merit and the motion was denied. Thomas appeals from this adverse ruling.
 "The sole question briefed on appeal by Thomas' appointed counsel is whether Thomas was denied effective assistance of counsel because his employed trial attorney, James Bell, failed to motion the trial court to appeal `in forma pauperis.' This is a departure from the 27.26 motion in which Thomas declared he had paid to get a transcript and perfect the appeal but Mr. Bell forgot to do it. The motion says nothing about suing as a poor person. Ex gratia
we will consider the motion amended to raise the issue of counsel's failure to move the trial court for an order allowing Thomas to sue as a poor person. Compare State v. Warren, 321 S.W.2d 705[1] (Mo. 1959).
 "At the evidentiary hearing Thomas testified he retained attorney James Bell and paid for the legal services; that Bell told him he would file an appeal but it was never perfected because Bell would not pay for a transcript. Thomas offered no testimony about his past financial condition.
 "The state offered the testimony of James Bell, who maintained that Thomas' appeal was not perfected solely because Thomas never paid to have the transcript prepared. Bell testified that on numerous occasions he told Thomas of the need for money to defray the cost of the transcript. Thomas' only response was that he would pay for the transcript when he `got himself together.' Bell explained to Thomas that if he did not submit a transcript his appeal would be dismissed and he would end up doing 20 years. At no time did Thomas tell Bell that he did not have the money nor did he ever request Bell to appeal for him as a poor person.
 "The evidence or lack thereof adduced at the evidentiary hearing compels the conclusion that Thomas was not denied effective assistance of counsel. On the contrary, Thomas ignored counsel's assistance and admonition and the judgment is therefore affirmed.
In accord, see Trout v. State, 523 S.W.2d 529 (Mo.Ct.App. 1975).
We are of the opinion that Thomas, supra, is correct, and adopt it. We are also of the opinion that, as was implied in Robinson, supra, by now granting Hope an appeal of his conviction would be allowing him to profit from invited error. This we will not do.
We believe that we have addressed each of the factual contentions of the appellant in this case. Appellant was represented by able and diligent counsel in his petition for writ of error coram nobis. We find however that he was also represented by able and diligent counsel in his original trial. In a case charging conspiracy to murder, based on taped conversations of the accused, defense is, of course, extremely difficult. Hearing the accused speak the actual words making up the conspiracy to murder is tantamount to listening to a confession. We are convinced the circuit judge in this case did not err in denying the petition for writ of error coram nobis. After a thorough and sifting consideration of every issue presented in this case, we affirm.
AFFIRMED.
All the Judges concur. *Page 1224