The appellant, Lucille Parker, was indicted and convicted for the murder of her son Hodges J. Parker, which is proscribed by § 13A-6-2(a)(1), Code of Alabama 1975. She was sentenced to the minimum punishment of twenty years' imprisonment. §13A-5-6(a)(4).
Although the prosecution's witnesses were widely disparate in their versions of the details before and after the shooting, each presented a strong, solid case of intentional murder. The testimonies, as a whole, presented the following in support of the charge of murder.
Around 7:00 a.m. on June 5, 1981, after he had spent the night at a nearby "shot house," the victim went to Elsie Baker's house, which is next-door to his house where he lives with appellant, his father, and his brother. Elsie Baker was his cousin. At approximately 3:00 p.m., appellant went to Elsie's house to find the victim. In her hand, she had a pistol wrapped in a cloth. When she found the victim asleep on the sofa in the front room, she started hitting him with a child's plastic bat which she had picked up in the yard. She ordered him to go home and get his clothes and told him, "I'm going to put you out." The victim responded, "Now, mama, my brother was home, Frankie, he wouldn't let you do this to me." He also told her to go home and leave him alone, that he did not want to go home with her. She continued to argue with him until she warned, "I'm going to kill you." During this altercation, appellant scuffled with him and pointed her pistol toward his stomach.
Then, the victim went home with appellant. Appellant went into the house. However, when the victim said he was going into the house to get his clothes, appellant would not let him go in. The victim then went to his car. Appellant, with the pistol in her hand, followed him to the car and chased him around the car several times. The victim repeatedly told her to leave him alone because he was about to leave. As he was facing her on the driver's side of the vehicle and reaching into his pocket for his keys, appellant shot him from a distance of approximately five feet. When Elsie's son, Eugene, caught the victim as he stumbled backward, appellant warned Eugene, "If you don't get on from here I shoot your black ass, too." Eugene dropped the victim. Appellant fired the weapon again, but Eugene was not wounded because appellant's other son, Horace, grabbed her hand and shoved the gun upward. Appellant then said she would kill *Page 283 
Eugene. She went inside her home and, after approximately five minutes, she returned carrying a rifle which was equipped with a scope. She stated, "Let the son of a bitch die." Horace took the rifle away from her. In the meantime, several bystanders took the victim to the hospital. Several hours later, one of Elsie's daughters asked appellant how the victim was. She responded that she was going to see if the son of a bitch was dead.
Shortly after the shooting, when questioned by a deputy, the victim stated that "his mama did this to him." The deputy could not smell any alcohol on the victim's breath.
At the hospital at 6:15 p.m., appellant gave a statement to a police detective. The detective noted that, at this time, she did not appear to be upset or out of control of her faculties. In the statement, appellant explained that she was sixty-three years old, had a seventh-grade education, and worked as a bus driver for Senior Aid. In admitting to shooting her son with a .25 automatic, she explained as follows:
 "[The victim] was drunk, disorderly, using profane language and I went and tried to talk to him, and he got violent. And I had no other alternative. He be's like that when he's drunk and unruly. . . . No, [he had no weapon,] he was trying to fight. . . . He kept coming up on me and shoving me."
She further explained that she did not have the gun when the victim and she started arguing, but that she got it when she went back home, " 'cause I seen what kind of shape he was in. Nobody can tell him nothing when he gets like that." Later, after appellant gave this statement, she voluntarily turned the pistol over to the detective. It had two shells in its clip.
The prosecution also elicited the testimony from Elsie that the victim had had nothing alcoholic to drink that day, but that when he did consume alcohol, "he was rough" and "quick about fighting and all." Another witness testified that the victim had been drinking that day, but that he was not drunk. In addition, the eye-witnesses to the altercations between appellant and the victim testified that they did not see the victim strike appellant.
In defense of the charge against her, appellant testified as follows: At the time of his death, the victim was forty-six years old and had lived with his father and her for the majority of the last fifteen years. The victim stayed intoxicated for the most part during the year prior to his death. He got drunk everywhere he went, and nearly every weekend she had to go get him from one of these places because he had started a fight or argument. When he was drunk, he loved to fight. Because he came home drunk so often, appellant tried to keep the victim's and Horace's three firearms hidden; she had hidden two and the police had taken one.
Appellant also said that on the day of his death, the victim came home about 5:00 a.m. and went to bed. Appellant went to work later in the morning, and when she came home from work at approximately 3:30 p.m., she heard the victim next-door where more than ten people appeared to be having a party. After she cooked dinner, her husband suggested that she go next-door to talk to the victim; they could hear the victim using a lot of profanity. She went next-door and found, in the front room, only the victim standing and a baby on the bed. She told the victim, "Junior, you need to come on out of here and go home and go to sleep." The victim, who was drunk, replied that he was not coming home. As appellant backed down the stairs, he started after her and told her that "he'd come out there and kick [her] back over there." At this threat, appellant picked up a child's plastic bat and went home. During this first confrontation, appellant had no pistol; in her hand, she only had a washcloth with alcohol on it because she had burned her hand.
Appellant's testimony continued: Approximately thirty minutes later, appellant heard the victim, as he was coming from next-door, warn that "he coming over there and kick [them]." She immediately took the rifle, which had been placed beside a window after it had been taken away from the victim about one or two weeks prior, *Page 284 
and hid it behind her bed. She also took the pistol, which belonged to Horace and which was hidden from him because he drank, from under her mattress because one of her sons knew where it was. She was going to hide it, too, but she did not have time to find another place. The victim then entered the house and made it clear that he wanted an altercation with his father to kill him. He said he was going to beat his father, and appellant was concerned that "they was just either kill each other." So, appellant pointed the pistol, which was still in her hand, at the victim and he backed out the door. As he was backing out, appellant told him to "go on back over there, if he wanted somebody to kill him," and the victim was cussing and saying he wanted her to let him in the house to beat his father. When they were outside, beside the driver's side of a car, the victim pulled a pistol from his pocket and grabbed appellant. Appellant knocked the victim's gun from his hand, and they "had ahold" of each other. The victim slung her against the car, and as she struck the car, the gun in her hand hit against the car and discharged. Eugene approached them and separated them. Horace took the pistol from appellant's hand, and she went back into the house. The victim walked down the driveway.
Appellant further stated that before the shooting she did not know if the pistol was loaded or unloaded and that she did not know that it was cocked. She also testified that she neither fired the pistol a second time nor exited the house again carrying a rifle. She explained that she was holding the gun wrong, that she had never shot a gun before, and that her fingers had been injured when the pistol was fired. Finally, appellant stated that she did not intend to shoot her son and that she was not afraid that he would harm her.
Horace testified on behalf of his mother, as follows. He heard appellant and the victim arguing next-door, so he went over there. The victim was "about drunk" and "raising all kind of sand," which included calling appellant a "gray-headed mother fucker." Appellant had picked up a plastic bat and hit the victim with it. Horace took appellant home. Horace did not see appellant carrying a pistol at this time. The victim followed and, although Horace tried to keep the victim from entering the house, the victim broke into the house by breaking and smashing the screen door. He was "on a rampage." Either appellant or her husband, who were in the kitchen, knocked the victim backward, out of the house. The three — appellant, her husband, and the victim — began arguing. Horace took the victim back outside and told him to leave, but the victim refused. Appellant joined her two sons outside. This time she had a pistol. As Horace was turning away from appellant and the victim, appellant was holding the gun, but not pointing it at the victim, and the victim had one hand in the air and one in his pocket. Then, he heard a shot fired. He grabbed the weapon from appellant's hand. No second shot was fired. Eugene took the victim, and appellant went back into the house. As the victim was leaving for the hospital, appellant came outside with a rifle, but went back into the house. At no time did Horace hear her say that she would shoot anyone who tried to help the victim.
In addition, Horace testified that the victim was violent when he was drunk, as he was on the day of his death. Horace also noted that the last place he had seen the weapon which killed his brother was in a bag which was hanging on a wall in his room and that he left the pistol ready to shoot.
Appellant's husband also testified. He stated that he saw the victim at approximately 9:30 a.m. and he was drinking; that later in the afternoon, after appellant had come home from work, the three of them were in the front room; that the victim started choking him, appellant made him turn loose, and he went to his room; that, during this confrontation, the victim was "pretty full of whiskey"; and that he saw the victim drunk "pretty regularly."
Dr. Walker, who attended the victim, testified that, on arrival at the hospital, the victim was agitated and uncooperative, and appeared to be intoxicated. Finally, Deputy Wilkerson testified that appellant's general *Page 285 
reputation was very good; the victim's reputation was bad; and he had been to the appellant's home on several occasions when the victim "was drunk, raising cane, fighting."
After each side had rested, the following occurred outside the presence of the jury:
 "THE COURT: . . . . Let me be sure I understand, now the position that the Defendant is taking, Mr. Ashbee [defense counsel].
 "Is the Defendant alleging that her actions were in self-defense?
"MR. ASHBEE: No, sir.
". . . .
 "THE COURT: The Defendant is taking the position that the gun went off accidentally; is that the position that the Defendant is taking?
"MR. ASHBEE: Yes, sir.
 "THE COURT: What are you requesting that the Court charge the Jury on?
 "MR. ASHBEE: Judge, our defense is strictly based on an accident. We're going to contend that at the time this incident occurred, that because of his behavior, he was drunk and unruly, we've got plenty of testimony that that's the way he acted on those occasions when he was drunk, that it was perfectly consistent with his behavior toward his mother on that occasion that he grabbed her and slung her, and that in this fracas, the gun went off. And that — that's our defense, it was strictly an accident, and partly was brought on by his own behavior.
 "THE COURT: Are you requesting the Court to charge, then, only on murder?
"MR. ASHBEE: Yes, sir.
 "THE COURT: If that's what you are requesting the Court to do, the Court will so charge only on murder.
 "I must admit, and I'll say it for the record, I had some — I had some question in my mind whether a charge on manslaughter would be appropriate, and I wasn't sure as to the position taken by the Defendant on the issue of self defense, because there was testimony to the effect of him grabbing her and throwing her, and whether or not that was self defense is a — maybe for a Jury determination, but it's not requested, a charge on self defense, and I will not charge self defense.
 "The — as to manslaughter, I feel that, I must admit, my opinion was to charge on manslaughter as a lesser included offense in this case. . . .
 "If you do not wish for a charge on manslaughter, then I will not charge on manslaughter.
". . . .
 "MR. ASHBEE: . . . . I would just like to state that I've discussed this issue thoroughly with my client, Mrs. Parker, and have explained to her the differences between murder and manslaughter; what constitutes manslaughter, and that [I] have also discussed with her the defense of self defense; the defense of the sanity defense, particularly the heat of passion defense; Mrs. Parker has told me and has insisted and I think that's her position today, that what happened out there was an accident, clear and simple.
"And is that correct, Mrs. Parker?
"THE DEFENDANT: That's right.
 "MR. ASHBEE: All right. So, that has to be our defense, Judge, and that's — for that reason, she did not have the intent to constitute murder, and we say that she did not recklessly cause the death of another person, because she did nothing toward anything that would cause recklessness, under the definition — under that definition of manslaughter. And she did nothing that would cause his death under circumstances that would constitute murder. So, for that reason, we would ask that the Judge not charge on manslaughter."
Appellant raises only one issue on appeal: "Whether trial counsel's failure to request charges on self defense or the lesser included offenses of murder deprived the appellant of a fair trial." Appellant now contends on appeal that she was denied effective assistance of counsel despite her having raised no objection when her counsel assured the trial court that the defense approach was a calculated strategy of both attorney and client. *Page 286 
To sustain an allegation of ineffective assistance of counsel, defendant must meet the two-prong test set out inStrickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984). First, a defendant must make a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," id. at 687, 104 S.Ct. at 2064, and second, he must show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable,"id.
In observing the Strickland Court's mandate that a reviewing court "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689, 104 S.Ct. at 2065, we find that counsel's failure to request charges on self-defense, manslaughter, and criminally negligent homicide falls within the range of sound trial strategy, for appellant has failed to establish a clear showing of misrepresentation to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,' " id.
This court has previously explicitly held that "requests for jury charges are included in the 'practical questions' that an attorney must deal with in formulating trial strategy, seeTrammell [v. State, 276 Ala. 689, 166 So.2d 417 (1964)], and, consequently, should be left to the trial attorney's judgment.Hall [v. State, 421 So.2d 1334 (Ala.Cr.App. 1982)]; Goodman [v.State, 387 So.2d 862 (Ala.Cr.App.), cert. denied, 387 So.2d 864
(Ala. 1980)]." Zeigler v. State, 443 So.2d 1303, 1307
(Ala.Cr.App. 1983). The court, in Hope v. State, 476 So.2d 635,645 (Ala.Cr.App. 1985), quoted and followed this rationale. Moreover, the court in Haynes v. State, 461 So.2d 869, 874
(Ala.Cr.App. 1984), also noted that request for jury instructions is a matter of trial strategy and, absent a clear showing of improper or inadequate representation, is to be left to the judgment of counsel. Furthermore, "[i]t is also well established that, even if the game plan of the defense or a tactic should fail, such does not amount to ineffective assistance of counsel." Hope, 476 So.2d at 645 (citations omitted). "Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland,466 U.S. at 689, 104 S.Ct. at 2065.
In regard to counsel's failure to request a charge on self-defense, we note that self-defense and accident are inconsistent defenses. Bradford v. State, 512 So.2d 134
(Ala.Cr.App. 1987); Lawson v. State, 476 So.2d 116, 119
(Ala.Cr.App.), cert. quashed, 476 So.2d 122 (Ala. 1985). Defense counsel need not request an instruction which is inconsistent with his trial theory. Butcher v. Marquez, 758 F.2d 373, 377
(9th Cir. 1985). Moreover, a review of appellant's evidence clearly shows that a self-defense theory is not very plausible.See generally § 13A-3-23, Code of Alabama 1975.
In regard to counsel's failure to request instructions on the lesser included offenses of manslaughter and criminally negligent homicide, it is without question that, under the evidence presented, appellant was entitled to an instruction on manslaughter and, arguably, to an instruction on criminally negligent homicide. However, even if the evidence supports jury instructions on lesser included offenses, the failure of counsel to request charges on the pertinent lesser included offenses does not necessarily render counsel's assistance ineffective. Grant v. State, 696 S.W.2d 74
(Tex.Dist.Cr.App. 1985). "The rationale behind the strategy [of electing not to request instruction on lesser included offenses] is based on the idea that the jury will be more likely to find an accused not guilty if there are only two choices open to it." Henderson v. State, 281 Ark. 406, 409,664 S.W.2d 451, 453 (1984). See also Heinlin v. Smith,542 P.2d 1081, 1082 (Utah 1975) (wherein the court noted that counsel's failure to request a lesser included offense instruction was not unreasonable, but a likely tactic involving the idea that an all-or-nothing stance might better lead to an outright acquittal); State v. Koller, 87 Wis.2d 253, 274 N.W.2d 651
(1979) (same). From counsel's approach to the facts and his treatment of the witnesses, *Page 287 
appellant, and the victim, it is obvious that defense counsel, in pursuing an "all or nothing" trial strategy, was gambling that the jury would acquit appellant because of a general repulsion to the victim's continual drunken state, violent behavior when drunk, and disrespectful treatment of his parents, at his age of forty-six, and a sympathetic attitude toward the sixty-three-year-old woman who, while merely trying to keep her son from killing her husband and his father or vice versa, accidentally shot her first-born son, her only son for eighteen years. Under these circumstances, counsel reasonably could have believed that it would be a bad tactical choice to offer lesser included offense instructions to give the jury the alternative of choosing a lesser included offense if it felt uneasy about convicting on the charge of murder. See Beasley v.Holland, 649 F. Supp. 561, 567 (S.D.W.Va. 1986).
It is quite obvious from the colloquy between appellant, appellant's defense counsel, and the trial court that the decision not to submit the instructions was indeed part of a deliberate defense strategy. Compare People v. Bell, 152 Ill. App.3d 1007, 106 Ill.Dec. 59, 505 N.E.2d 365 (1987). In fact, appellant herself argued against submission of the lesser included offense alternatives; as noted by her counsel, she "insisted . . . that what happened out there was an accident, clear and simple." Although appellant received only a seventh-grade education and had voluntarily committed herself for treatment of mental problems after the death of the victim, she was declared competent, after examination, to stand trial and her counsel was required to fully consider her stated defense. See Mulligan v. Kemp, 771 F.2d 1436, 1441-42 (11th Cir. 1985). "[I]n evaluating strategic choices of trial counsel, we must give great deference to choices which are made under the explicit direction of the client." Id. at 1441 (citingStrickland, 466 U.S. at 691, 104 S.Ct. at 2066). Accordingly, "if [counsel] is commanded by his client to present a certain defense, and if he does thoroughly explain the potential problems with the suggested approach, then his ultimate decision to follow the client's will may not be lightly disturbed." Id. at 1442 (footnote omitted). Appellant chose not to risk the possibility that a doubtful jury would compromise by finding her guilty of a lesser offense rather than continue to debate her guilt or innocence of murder. Defense counsel cannot be faulted for abiding by this decision.
Under these circumstances, we cannot say that counsel's decisions were unreasonable and "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." This court can not speculate on what may have been the most advantageous strategy; we must abide by the mandatory presumptions set forth in Strickland. These presumptions have not been overcome.
Furthermore, appellant has failed to meet her burden of establishing the prejudice component of Strickland. In view of the overwhelming evidence of intentional murder, we find no reasonable probability ("a probability sufficient to undermine confidence in the outcome," id. 466 U.S. at 694,104 S.Ct. at 2068) that, but for counsel's failure to request lesser included offense instructions (assuming that is considered an unprofessional error), the result of appellant's trial "would reasonably likely have been different," id. at 696,104 S.Ct. at 2069, or "the factfinder would have had a reasonable doubt respecting guilt," id. at 695, 104 S.Ct. at 2068-69. In making this determination, we have considered the totality of the evidence before the jury, as required by Strickland,466 U.S. at 695, 104 S.Ct. at 2069. Since appellant has not challenged her conviction on grounds of evidentiary insufficiency, we must presume that the jury acted according to law and "reasonably, conscientiously, and impartially appl[ied] the standards that govern the decision." Id. at 695, 104 S.Ct. at 2068. Thus, we conclude that the jury, in rendering a guilty verdict, found all the elements of murder. In holding that appellant failed to establish the prejudice component, we adopt the following:
 "Here, there is no 'reasonable probability' sufficient to undermine our confidence *Page 288 
in the outcome of the trial. Considering the 'totality of the evidence before the jury' and the 'fundamental fairness' of [appellant's] conviction, we find that the conviction is not 'unreliable' and that the conduct of [appellant's] counsel at trial cannot be found to be unreasonable or ineffective. Strickland, supra."
Richardson v. State, 456 So.2d 1152, 1156 (Ala.Cr.App. 1984).
For the foregoing reasons, this cause is affirmed.
AFFIRMED.
All Judges concur. *Page 535